THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JAMES MROZEK, Defendant-Appellant.

Third District    No. 76-145

Opinion filed September 21, 1977.

Robert Agostinelli and Verlin R. Meinz, both of State Appellate Defender's Office, of Ottawa, for appellant.

Edward Petka, State's Attorney, of Joliet, for the People.

Mr. PRESIDING JUSTICE STENGEL delivered the opinion of the court:

Defendant James Mrozek was indicted for murder and convicted of voluntary manslaughter after a jury trial in the Circuit Court of Will County. He received a prison sentence of from 2 2/3 to 8 years. The issues on appeal are whether the defendant was entitled to discharge under the speedy trial statute (Ill. Rev. Stat. 1975, ch. 38, par. 103—5), and whether the trial court correctly refused defendant's motions to suppress a confession and identification.

The facts as revealed during defendant's trial and combined hearing on his motions to suppress confession and identification indicate that Beverly Mrozek died of strangulation between 8 a.m. and 12 p.m. on June 7, 1974. At 6 a.m. on June 8, 1974, defendant James Mrozek, an unskilled worker with a 10th-grade education, entered the Joliet police station to

complain about a beating allegedly inflicted upon him by Joliet policemen. After filing his complaint, Mrozek attempted to leave the station but was told to remain by an officer.

Sergeant Clifford Erwin began questioning Mrozek about his wife's death at 6:30 a.m. When defendant stated that he had not seen his estranged wife for more than two months, Erwin told him that he had been seen at Beverly's apartment on the morning of June 7 and that he was a suspect in the murder investigation. Defendant received *Miranda* warnings at 7:15 a.m., but agreed to talk with Erwin without a lawyer being present. Mrozek told Erwin that he arrived in Joliet by bus on the evening of June 6, but was unable to account for his whereabouts over the next 24 hours. During the interrogation defendant repeatedly stated that he had not slept since arriving in Joliet and that he did not kill his wife. He also made several inquiries concerning his right to remain silent.

Later in the morning Detectives Knott and Grossklaus joined Erwin in questioning Mrozek. As a result of their interrogation defendant admitted that his brother had dropped him off within a dozen blocks of Beverly's apartment at 7:30 a.m. on June 7. Defendant did not, however, admit killing his wife or being at her apartment on the day she died. Finally at 10:20 a.m. defendant requested to see an attorney, and the interrogation immediately ceased.

Defendant was charged with murder and placed in a cell with some other prisoners. At 3 p.m. Detectives Hafner and Hulbert removed defendant to an isolated cell in another part of the jail to resume questioning. The detectives did not give defendant complete *Miranda* warnings because, as Hafner testified, they thought he had waived them. Defendant refused to talk, however, stating that, "I don't know, maybe I should see a lawyer, I need time to think." The detectives asked if they could return later and defendant agreed.

At 6 p.m. the detectives returned to defendant's cell but he again refused to talk to them. Hafner told Mrozek that he looked nervous and should get some sleep.

When the detectives returned to Mrozek's cell at 11:25 p.m. he was lying awake on his bunk. Hafner testified that the defendant seemed to be emotionally distraught. The detectives made three attempts to get defendant to talk, but he still insisted on seeing a lawyer. At this point Detective Hulbert appeared angry and told his partner they should leave. Hafner, however, explained that his brother, who reminded him of the defendant, had once been in trouble with the law and that he was certain defendant, like his brother, would not be able to live with the memory of what he had done. So Hafner again asked defendant whether he wanted to talk and this time the defendant agreed. It is noteworthy that despite

the fact Hafner had read Sergeant Erwin's report on the case, both he and Hulbert testified that they were unaware that defendant had requested to see a lawyer at 10:20 a.m.

Defendant's incriminating statements to the detectives were tape-recorded the next morning in the presence of several Joliet police officers. This tape, which was admitted into evidence and played for the jury at defendant's trial, indicated that he arrived in Joliet at 7 a.m. on June 7, that he rode a bus to downtown Joliet and began drinking, that he took a cab from the bar to Beverly's apartment, that he approached Beverly about reconciling their marriage, that she rebuffed him, that a fight ensued and that the last thing he remembered was placing his hands around her throat. The psychiatrists who testified at the trial all agreed that Mrozek was suffering from amnesia which prevented him from remembering later events. As a result of Mrozek's statement, the police were able to locate the cab driver who had driven him to Beverly's apartment, and he identified defendant at the trial.

The first issue is whether defendant was denied a speedy trial. According to the record, on June 10, 1974, a criminal complaint was filed charging the defendant with the murder of Beverly Mrozek; counsel was appointed to represent defendant; and he was remanded without bail to the sheriff's custody. A preliminary hearing was held on June 25. On September 17 defendant was declared fit to stand trial after a competency hearing. On October 1 the case was continued on defendant's motion until October 15. Defendant filed a timely motion to substitute judges on October 21 which was not granted until November 7, because the judge who was originally assigned to the case was away on vacation when it was filed. At the same time, the court set a trial date of February 17, 1975, which due to holiday, was set over until February 18. On January 22, 1975, defendant filed a motion to suppress confession.

On February 18, 1975, over defendant's objection, the State was granted a continuance until March 3 due to the unavailability of a material witness. At the same hearing defendant moved for discharge under section 103—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1975, ch. 38, par. 103—5) and a hearing was ordered for February 21. Following the hearing the motion was taken under advisement and denied on February 24. The trial court based its denial on the grounds that the motion for substitution tolled the 120-day period which did not begin to run anew until November 7, the date the motion was granted.

On March 3, 1975, the State was granted a second continuance until April 23, the date set for hearing on defendant's motion to suppress confession. On April 17 defendant filed a motion to suppress identification. The hearing on these motions was continued until April 28 due to the trial judge's unavailability, and the motions were denied on

April 29 after two days of proceedings. Jury selection finally began on May 6 and the trial commenced on May 9, 1975.

I

■■ The right to a speedy trial is guaranteed by both the Illinois and Federal constitutions. (Ill. Const. 1970, art. I, §8; U. S. Const., amend. VI.) These constitutional speedy trial provisions are based on the individual's right to liberty and their whole purpose is to prevent an accused from being kept in jail at the whim of the prosecutor without having him tried on a pending indictment or information. *People v. Kidd* (1934), 357 Ill. 133, 191 N.E. 244; *People v. Lowe* (1st Dist. 1965), 61 Ill. App. 2d 262, 210 N.E.2d 31.

Section 103—5 (Ill. Rev. Stat. 1975, ch. 38, par. 103—5) was designed to implement the constitutional guarantee of a speedy public trial. (*People v. Nowak* (1970), 45 Ill. 2d 158, 258 N.E.2d 313; *People v. House* (1957), 10 Ill. 2d 556, 141 N.E.2d 12.) Subsection (a) of 103—5 provides that:

"(a) Every person in custody in this State for an alleged offense shall be tried by the court having jurisdiction within 120 days from the date he was taken into custody unless delay is occasioned by the defendant, by an examination for competency ordered pursuant to Section 104—2 of this Act, by a competency hearing, by an adjudication of incompetency for trial, by a continuance allowed pursuant to Section 114—4 of this Act after a court's determination of the defendant's physical incapacity for trial, or by an interlocutory appeal." Ill. Rev. Stat. 1975, ch. 38, par. 103—5(a).

■■■ To obtain a discharge under section 103—5 the defendant must show that he was committed, gave no bail, was not tried within 120 days and did not delay his trial. (*People v. Jones* (1965), 33 Ill. 2d 357, 211 N.E.2d 261.) Since an accused in custody has no duty to demand a trial (*People v. Byrn* (5th Dist. 1971), 3 Ill. App. 3d 362, 274 N.E.2d 186), the 120-day period in this case began on June 10, 1974, the date defendant was denied bail and remanded to the sheriff's custody. In the absence of delay occasioned by defendant the statutory period would have run on or about October 10, 1974.

■■ In determining whether delay is occasioned by the defendant, the criterion in each case is whether the defendant's acts in fact caused or contributed to the delay. (*People v. Fosdick* (1967), 36 Ill. 2d 524, 224 N.E.2d 242.) If the defendant is chargeable with delay in this case the 120-day period begins to run anew from the date the delay occurred. *People v. Wilson* (5th Dist. 1974), 19 Ill. App. 3d 466, 311 N.E.2d 759.

■■■ In our opinion defendant caused four delays each of which tolled the running of the statute. The first delay occurred on September

17, 1974, when the court held a competency hearing at defendant's request. The second delay was occasioned by his motion for a continuance on October 1, 1974. The third delay stemmed from defendant's motion to substitute judges. (*People v. Spicuzza* (1974), 57 Ill. 2d 152, 311 N.E.2d 112; *People v. Murphy* (2d Dist. 1977), 47 Ill. App. 3d 278, 361 N.E.2d 842.) A fourth delay was occasioned by defendant's motions to suppress confession and identification which resulted in a two day hearing on April 28 and 29, 1975. (*People v. Kemp* (1st Dist. 1977), 49 Ill. App. 3d 270, 364 N.E.2d 944.) Since the final delay chargeable to the defendant occurred a little more than a week before his trial, we hold that he was denied his right to a speedy trial.

## II

On a motion to suppress a confession the State must prove by a preponderance of the evidence that the accused was advised of his constitutional rights and that he knowingly and intelligently waived them before his statements can be used against him at trial. (*Lego v. Twomey* (1972), 404 U.S. 477, 30 L. Ed. 2d 618, 92 S. Ct. 619; *People v. McClure* (1st Dist. 1976), 43 Ill. App. 3d 1059, 358 N.E.2d 23; *People v. Markiewicz* (1st Dist. 1976), 38 Ill. App. 3d 495, 348 N.E.2d 240; Ill. Rev. Stat. 1975, ch. 38, par. 114—11(d).) The trial court's ruling on defendant's motion should not be reversed unless it is contrary to the manifest weight of the evidence (*People v. Medina* (1st Dist. 1976), 37 Ill. App. 3d 1029, 347 N.E.2d 424; *People v. Wipfler* (3d Dist. 1976), 37 Ill. App. 3d 400, 346 N.E.2d 41), and this is true regardless of whether the motion involves a confession or merely admissions. *People v. Fox* (3d Dist. 1970), 131 Ill. App. 2d 604, 264 N.E.2d 502.

■■ In ascertaining whether a defendant's statements are voluntary the court must consider the totality of circumstances surrounding such statements (*People v. Simmons* (1975), 60 Ill. 2d 173, 326 N.E.2d 383), including the defendant's age, intelligence, background, mental capacity and education. (*People v. Wipfler* (3d Dist. 1976), 37 Ill. App. 3d 400, 346 N.E.2d 41.) Other factors include whether the defendant was subjected to a lengthy interrogation or incommunicado incarceration (*Miranda v. Arizona* (1966), 384 U.S. 436, 476, 16 L. Ed. 2d 694, 724, 86 S. Ct. 1602, 1629), whether there was a delay in presenting defendant to a judge for preliminary hearing (*People v. Pittman* (1973), 55 Ill. 2d 39, 302 N.E.2d 7), whether the defendant slept while incarcerated (*People v. Pittman*), whether he was emotionally distraught (*People v. Merkel* (2d Dist. 1974), 23 Ill. App. 3d 298, 319 N.E.2d 77), and his prior criminal experience (*People v. Clemens* (1st Dist. 1972), 9 Ill. App. 3d 312, 292 N.E.2d 232).

■■ The constitutional safeguards delineated in *Miranda* attach whenever an accused is subjected to "custodial interrogation," *i.e.*,

questioning initiated by law enforcement officers after a person has been taken into custody or deprived of his freedom in any significant way. (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S..Ct. 1602.) Although Mrozek voluntarily appeared at the station house, he was clearly "in custody" based on the fact that the police had been looking for him in connection with Beverly's death and that he was not permitted to leave the police station or even to go unaccompanied to the water fountain. See *People v. Dunn* (1st Dist. 1975), 31 Ill. App. 3d 854, 334 N.E.2d 866, *cert. denied*, (1976), 426 U.S. 950, 49 L. Ed. 2d 1187, 96 S. Ct. 3171; *People v. Bryant* (4th Dist. 1967), 87 Ill. App. 2d 238, 276 N.E.2d 845.

■■ The mere fact that Mrozek answered some of Erwin's questions did not result in a waiver nor did it deprive him of the right to subsequently exercise his constitutional rights and refrain from answering other questions. (*Miranda v. Arizona* (1966), 384 U.S. 436, 445, 16 L. Ed. 2d 694, 707, 86 S. Ct. 1602, 1612.) This is precisely what occurred at 10:20 a.m. when defendant requested an attorney.

The controlling principle in this case is that, "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." (*Miranda v. Arizona* (1966), 384 U.S. 436, 474, 16 L. Ed. 2d 694, 723, 86 S. Ct. 1602, 1628.) Absent attenuated circumstances (see *People v. White* (1975), 61 Ill. 2d 288, 335 N.E.2d 457, *cert. denied* (1976), 424 U.S. 970, 47 L. Ed. 2d 738, 96 S. Ct. 1469; but *cf. People v. Medina* (1st Dist. 1976), 37 Ill. App. 3d 1029, 347 N.E.2d 424), this rule has been strictly applied in Illinois cases, including our own decisions, to prevent statements made in derogation of defendant's right to have an attorney present during questioning from being admitted at trial. (See *People v. Morrissey* (1st Dist. 1977), 49 Ill. App. 3d 622, 364 N.E.2d 454; *People v. Washington* (2d Dist. 1976), 41 Ill. App. 3d 475, 354 N.E.2d 501; *People v. Parnell* (3d Dist. 1975), 31 Ill. App. 3d 627, 334 N.E.2d 403; *People v. Medina.*) Most recently in *People v. Rafac* (3d Dist. 1977), 51 Ill. App. 3d 1, 4, 364 N.E.2d 991, 993, we stated that:

> "When the defendant Rafac indicated his interest in having legal counsel the interviewing officer should have considered such an interest on the part of defendant Rafac as a 'red light' which compelled a stopping or cessation of all further inquiry of the defendant. To proceed further with the interrogation of the suspect as was done in the instant case as regards the defendant Rafac constitutes reversible error."

■■ In the instant case Officer Erwin terminated questioning upon defendant's request for an attorney, but Detectives Hafner and Hulbert did not. Defendant's statement to the detectives that, "maybe I should see a lawyer," might be construed as a "red light" to further questioning,

but we need not answer this question in order to decide the case. Notice that a defendant has requested an attorney will be imputed to any officer who subsequently interrogates the accused, regardless of whether or not he actually knows this fact. *People v. White* (1975), 61 Ill. 2d 288, 335 N.E.2d 457; *People v. Medina* (1st Dist. 1976), 37 Ill. App. 3d 1029, 347 N.E.2d 424.

■ Defendant's constitutional rights were therefore violated by the detectives' attempts to question him. The record also shows that defendant was subjected to a lengthy interrogation, that he was isolated from other prisoners, that he was not given a preliminary hearing until June 15, 1975, that he had a limited education and virtually no prior criminal experience. Additionally, the trial court was bound to accept the uncontroverted testimony that defendant was emotionally distraught and had not slept for more than 24 hours. (*People v. Peck* (1st Dist. 1974), 18 Ill. App. 3d 112, 309 N.E.2d 346.) Under such circumstances we hold that the trial court's finding that Mrozek's admissions were voluntary is contrary to the manifest weight of the evidence and that its error was not harmless beyond a reasonable doubt. *Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824.

Accordingly, defendant's conviction for voluntary manslaughter is reversed, and the cause remanded for a new trial.

Judgment reversed and remanded.

ALLOY and BARRY, JJ., concur.